# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 13, 2015 Session

## STATE OF TENNESSEE v. JAY HERMAN SANDERS

**Appeal from the Circuit Court for Marion County**
**No. 9397-A     Thomas W. Graham, Judge**

---

## No. M2014-00346-CCA-R3-CD - Filed February 9, 2015

---

The Defendant, Jay Herman Sanders, appeals from the trial court's denial of an alternative sentence and order to pay $250,000 in restitution. He argues that the trial court abused its discretion when it sentenced him to 10 years in the Department of Correction and claims that the trial court failed to consider his future ability to pay restitution. After a review of the record and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Jerry H. Summers (on appeal) and Benjamin McGowan (at trial), Chattanooga, Tennessee, for the appellant, Jay Herman Sanders.

Herbert H. Slatery, III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; J. Michael Taylor, District Attorney General; and Sherry Shelton, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual and Procedural Background

The Defendant was indicted for theft of property valued at $250,000 or more and conspiracy to commit theft of property valued at $250,000 or more. Pending adjudication of the charges, the Defendant was released on bond in the amount of $20,000. While on

bond, the Defendant was arrested and charged with (1) possession of a Schedule II controlled substance (methamphetamine), (2) unlawful possession of a weapon, (3) possession of legend drugs (Oxycodone and additional pills), and (4) possession of drug paraphernalia. The trial court subsequently ordered that the Defendant be furloughed into Council for Alcohol and Drug Abuse Services ("CADAS"), an inpatient treatment program. Upon completion of the program, the trial court would reinstate the Defendant's original bond with the added conditions that he be drug tested on a weekly basis at his own cost, not possess any firearms, and not engage in any additional criminal conduct.[1]

After completion of the CADAS program, the Defendant entered into a plea agreement for the theft charges, pleading guilty to theft of property valued at $60,000 or more but less than $250,000, a Class B felony. The Defendant also agreed to a 10-year sentence and restitution between $60,000 and $250,000. The manner of service and amount of restitution was left to the trial court's discretion following a sentencing hearing.

At the sentencing hearing, Sergeant Matthew Minter of the Tennessee Highway Patrol explained the complex theft conspiracy.[2] The Defendant was employed by SCS Trucking ("SCS"), which was contracted to haul bushling[3] scrap metal from A.O. Smith Water Heater Services ("A.O. Smith") in Ashland City, Tennessee, to the victim's, Progressive Rail Services ("PRS"), facility in New Hope, Tennessee. The Defendant, along with an individual named Gary Alto, would drive two truck loads of bushling steel from Ashland City to the PRS facility in New Hope. When they reached New Hope, they would drive one of the trucks onto the scale and weigh it twice. The truck that had been weighed would stay at the PRS facility, but the Defendant would drive the second truck to Dodson's Scrap Yard ("Dodson's") in Whitewell, Tennessee where the bushling was unloaded. From there, Dodson's would sell the bushling to Thornton Iron & Metal ("Thornton") in Rogersville, Alabama. Thornton would pay the Dodson's driver with a check, and the driver would cash the check at a bank, usually on the same day. The cash was then delivered to Dodson's and divided equally between Dodson's and the Defendant. Sergeant Minter's investigation revealed that this scheme had been going on three to four times a week from at least September 2010 through August 2012–possibly starting as early as 2009.

_____

[1] The charges from the Defendant's subsequent arrest were still pending during the relevant proceedings on the theft charges.

[2] The Tennessee Highway Patrol initiated their investigation after representatives from Progressive Rail Services contacted them with suspicions that some of their inventory was being stolen.

[3] Bushling is a unique kind of steel left over from the water heater manufacturing process.

Dodson's did not keep records of their transactions with the Defendant or with Thornton. However, Sergeant Minter obtained the cancelled checks written by Thornton for scrap metal purchased from Dodson's as well as a spreadsheet, prepared by Thornton, documenting the transactions in which Dodson's had sold bushling to Thornton. In total, the spreadsheets indicated that Thornton had paid Dodson's $1,830,216.56 for bushling. An additional spreadsheet, covering August 1, 2012, through August 9, 2012, showed that Thornton had paid Dodson's $37,901.70 for bushling.[4] Sergeant Minter's investigation revealed that Thornton was paying comparatively fair market value for the bushling. He also confirmed that Dodson's was Thornton's sole supplier of bushling, and Dodson's only received bushling from the Defendant.

As part of his investigation, Sergeant Minter interviewed the Defendant on August 13, 2012. During that interview, the Defendant voluntarily admitted his involvement in the scheme and explained how it worked. The Defendant also admitted that the scheme was his idea and that he was "the mastermind." He explained that he split the money paid by Thornton equally with Dodson's. Then, from the money he received in the transaction, the Defendant would pay $50-$100 to security guards at the various scrap yards and a "small piece" to Mr. Alto for their participation in the scheme. The Defendant would also put some additional gasoline into the SCS truck so that it would not be apparent that he drove the truck off route to reach Dodson's in Whitewell.

In his interview with Sergeant Minter, the Defendant stated SCS paid him around $30,000 or $32,000 per year, and in a good year, he would be paid up to $43,000. He also stated that he "blended" the money he received from the scheme into his income, but he was unable to explain how he had spent the money he received through the scheme. The Defendant denied using drugs.

Bobbie Lambert testified that she was the North American district security manager for Caterpillar, Inc. ("Caterpillar"). PRS is a wholly-own subsidiary of Caterpillar. Caterpillar had a contract with SCS to transport steel, primarily bushling, from A.O. Smith in Ashland City, Tennessee to the PRS facility in New Hope, Tennessee. A.O. Smith is PRS's sole supplier of bushling. In 2011, PRS discovered that its inventory was "short," and they were concerned that they had a theft problem. To ensure that the shortage was not caused by a measurement error, the PRS scales were recalibrated. Then, in 2012, PRS learned that the Defendant had been seen at Dodson's with a load of bushling. Ms. Lambert explained that Dodson's was not on the route from A.O. Smith to PRS and there was no

---

[4] The spreadsheets were entered as exhibits at the sentencing hearing but are not included in the record on this appeal. Therefore, it is unclear from the testimony whether the $37,901.70 is included in or in addition to the $1,830,216.56 indicated in the spreadsheets.

reason for the Defendant to take the bushling to Dodson's. The PRS yard manager traveled to Dodson's and was able to identify material there as bushling. He "felt certain" that the bushling came from PRS, so he reported it to management. Management then decided to start an investigation. They conducted surveillance on the Defendant and, on two occasions, followed the Defendant as he drove a load of bushling from A.O. Smith to Dodson's. Also during the surveillance, Mr. Alto was observed weighing the same truck twice to produce two scale tickets. To avoid suspicion, after weighing the truck once, Mr. Alto would move the truck slightly off the scale so that the weights would vary. Then Mr. Alto assigned one ticket to his truck and one ticket to the Defendant's. Ms. Lambert explained that, during business hours, PRS would have someone on site weigh the trucks that came in. However, certain drivers who had established trust with PRS were given keys to the facility so that they could weigh their trucks and fill out the scale tickets on their own after hours.

Ms. Lambert testified that, based on an examination of the documentation, Caterpillar estimated that PRS would have been able to get $2.2 million for the bushling that the Defendant stole. She explained that, while Thornton paid fair market rate for the bushling, PRS would have been able to get a higher price because of "negotiated rates that [they] had and fluctuations in the market." However, she noted that the company wrote off the loss at $1.2 million.

On cross-examination, Ms. Lambert testified that she did not know the net revenues for PRS for the years covering the Defendant's scheme. She also did not know how the loss caused by the Defendant's scheme compared to Caterpillar's profits for those years.

Special Agent Mark Wilson of the Tennessee Bureau of Investigation ("TBI") testified that he was assigned to Marion and Sequatchie counties and that he has investigated several embezzlement cases over the past four or five years. He explained that embezzlement cases can be challenging investigations because they are very time-consuming and require a significant amount of resources to parse through the paper trail left by the defendants. These types of cases have been a particular problem in Marion County, and they often involve thefts over $10,000. On cross-examination, Special Agent Wilson explained that embezzlement cases were up statewide by approximately 2.2 percent in 2012. He also admitted that it helps the investigation when the defendant is forthcoming about his or her involvement in the offense.

Amanda Phillips, the Defendant's sister, testified that she was previously employed as an ombudsmen with the Fleet and Family Services while her husband was in the Navy. In that capacity, she received training relating to substance abuse. She stated that she had a close relationship with her brother. She noted that the Defendant began working immediately after he graduated from high school and he had continued to maintain employment since then. She also noted that the Defendant had a very close relationship with his daughter.

-4-

Ms. Phillips explained that the Defendant had used methamphetamine for many years, but his experience with the CADAS drug program had been "life changing" for both the Defendant and their family. She stated that their family saw "immediate changes" in the Defendant. CADAS was able to treat the Defendant's drug problem with behavior therapy and address the Defendant's struggle with depression. Ms. Phillips and the Defendant's wife also attended a weekly family program offered by CADAS. After being released from CADAS, the Defendant attended support group meetings regularly, and he was asked to lead some of the meetings. Also, through his recovery program, the Defendant had found many community members willing to support his recovery–many of whom attended the sentencing hearing. Ms. Phillips noted that the Defendant had tried to control his drug addiction before with little success. However, Ms. Phillips believed the Defendant's current sobriety had a better chance of success because CADAS had given him strategies to help control his addiction and he continued to go to CADAS for follow-up therapy.

Ms. Phillips stated that she and the Defendant both lived in very close proximity to each other and their parents. Their father was in poor health, and he depended on the Defendant "quite a bit." Because the Defendant lived next door to his parents, he would be the first person to respond if there was an emergency.

On cross-examination, Ms. Phillips stated that she did not know whether the Defendant owed money to anyone. However, she noted that both the Defendant's and her homes are in their father's name. She explained that, if the Defendant's situation was similar to her own, he did not have a mortgage on the home, he did not owe money to their parents for the home, and he did not pay taxes on the home. On redirect examination, Ms. Phillips stated that the Defendant indicated that he would be willing to sell his assets to make restitution payments. She further stated that, to her knowledge, the Defendant was not concealing any of his property.

Brent Basham of SETHRA Community Corrections testified that, since July 2013, he had been conducting weekly drug screens of the Defendant as a condition of his release on bond. Additionally, the Defendant had been reporting to Mr. Basham weekly since his release from the CADAS program. The Defendant told Mr. Basham that he was attending Alcoholics Anonymous ("AA") and Narcotics Anonymous ("NA") meetings almost every night, and each week the Defendant gave Mr. Basham logs of his meeting attendance to be included in his file. The Defendant was never uncooperative with Mr. Basham, and he always contacted Mr. Basham if he would be late to a meeting or if he needed to reschedule.

Jennie Hammock testified that she was a retired highway patrol officer. She was a friend of the Defendant's mother, and she knew the Defendant through her relationship with his mother. She knew the Defendant to have a good work ethic and was surprised to learn

that the Defendant had gotten into trouble.  She stated that she was willing to help monitor the Defendant if he were released and that her law enforcement background would help her in that endeavor.

Dave Sturdevant testified that he knew the Defendant from AA meetings.  Mr. Sturdevant explained that he had participated in AA meetings for 32 years and he believed that the Defendant was attending AA meetings "for all the right reasons."  The Defendant appeared to be seeking help for his addiction.  Mr. Sturdevant explained that, in his opinion, the Defendant's sobriety depended on the Defendant "working the program" and regularly attending meetings.  Based on observations of other people who had been incarcerated for a period of time, Mr. Sturdevant opined that the Defendant would not remain sober if he were incarcerated unless the facility had a "very active" AA program.  Mr. Sturdevant acknowledged that the Defendant had made impressive progress in his treatment in the months he had been attending meetings, but he explained that being part of a support program is very important to people struggling with addiction.

Kate Sanders, the Defendant's daughter, testified that she was very close to her father.  She lived with her mother but visited the Defendant every other Sunday and spoke with him twice a day.  The Defendant also attended all of her school activities.  She said that she was not aware that the Defendant was involved in a criminal scheme until he told her.  She was also unaware of the Defendant's drug use, and she noted that he was never hostile to her or her mother.  While the Defendant was in the CADAS program, Ms. Sanders attended a "family day" with her mother and other members of the Defendant's family.  After participating in the programs offered that day, Ms. Sanders said she felt that the Defendant could "come clean" to her about "things he had been hiding."  Since the Defendant's release from CADAS, Ms. Sanders had witnessed a "complete change" in the Defendant, and she said he seemed much happier.

The Defendant gave an allocution statement, apologizing to PRS for stealing the bushling.  He stated that he wished to make restitution.  He also apologized to his family and expressed "enormous regret" for his actions.

During closing arguments, the State argued that anything short of a sentence of incarceration would depreciate the seriousness of the offense.  The Defendant asked to be sentenced to Community Corrections.  Both parties informed the court that they had agreed to a maximum restitution amount of $250,000.

To determine the sentence, the trial court first looked to enhancing and mitigating factors.  The trial court determined that the following enhancement factors applied to the Defendant: (1) the defendant has a previous history of criminal convictions or criminal

behavior, in addition to those necessary to establish the appropriate range, noting that the proof established that the Defendant has used drugs since the age of 19; (2) the defendant was a leader in the commission of an offense that involved two or more criminal actors, stating that there was no doubt that the Defendant set up the scheme; (6) the personal injuries inflicted upon, or the amount of damage to property sustained by or taken from, the victim was particularly great, noting that the Defendant stole a substantial amount of money from the victim regardless of the fact that the victim was a large company; (8) the defendant, before trial or sentencing, failed to comply with conditions of a sentence involving release into the community, applying the Defendant's arrest while he was on bond to this factor; and (14) the defendant was in a position of public or private trust, stating that the Defendant was entrusted with the keys to the PRS scrap yard and allowed to transport a valuable product. As to mitigating factors, the trial court found only one: (10) the defendant assisted authorities in locating or recovering any property or person involved in the crime.

The trial court also looked to each of the probation considerations and concluded that the "vast majority" of the considerations weighed against granting probation. The court noted that the presentence report contained a "disturbing" statement from the Defendant about the scheme, in which he said:

> After this was going on for a while I got comfortable with the benefits. I traded up vehicles, paid outstanding doctor bills, cleaned up my credit, and spent money on drugs. The scheme quickly got out of control, and the longer I did it the less it seemed like I was hurting anyone.

The trial court considered this statement proof of "mal-intent" and said, "If anybody thought it was for anything other than just greed . . . [h]e's stated right there what it was. It made him more comfortable to get this money, and lots of it." The trial court also considered the statutory purposes and principles of sentencing.

The trial court then turned to the considerations for imposing a sentence of confinement. The court noted that the first factor, confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct, applies to the case "to some extent" due to the Defendant's long history of drug use. The trial court also found that the second consideration, confinement is necessary to avoid depreciating the seriousness of the offense or particularly suited to provide effective deterrence to others likely to commit similar offenses, applied to the Defendant. The trial court noted that the Defendant stole a significant amount of money and stated, "[T]o . . . have the only end result for that to be a form of probation into the community, to me, is just not what anybody that wrote the criminal statutes thought was appropriate." The trial court also rejected the notion that the seriousness of the offense was mitigated by the fact that the victim was a large corporation and the

money taken, even though objectively a large sum, had little effect on the company's bottom line. Finally, the trial court found that the third consideration, measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant, did not apply to this case. However, the trial court expressed concern that the Defendant had been arrested while on bond for these charges. Consequently, the trial court found that the Defendant was not a candidate for an alternative sentence and ordered him to serve 10 years in the Department of Correction.

The trial court set restitution at $250,000, and in doing so stated, "[T]hat would have to be the only logical thing I could do based on the total amount of the loss . . . So, you know, I don't know if you'll ever be able to pay that back, but if you can that would be the right thing to do. . . ." This timely appeal followed.

## II. Analysis

We first note that the record on appeal does not contain a transcript of the Defendant's guilty plea submission hearing. However, the transcript from the sentencing hearing is adequate to allow for meaningful review. Therefore, we will review the appeal on its merits and presume that the missing guilty plea submission hearing transcript would support the ruling of the trial court. See State v. Caudle, 388 S.W.3d 273, 279 (Tenn. 2012).

When a defendant challenges the length or manner of a sentence that reflects the purposes and principles of the Sentencing Act and is within the statutory sentencing range, we review the trial court's decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). As long as the sentence is consistent with the purposes and principles of sentencing, a within-range sentence should be upheld. Id. at 706. The enhancing and mitigating factors are now merely advisory. Id.; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Misapplication of an enhancement or mitigating factor will not invalidate a sentence "unless the trial court wholly departed from the 1989 [Sentencing] Act, as amended in 2005." Bise, 380 S.W.3d at 706. The same standard applies when a defendant challenges the denial of probation or other alternative sentence. Caudle, 388 S.W.3d at 278-79.

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2010); Bise, 380 S.W.3d at 706. However, "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]." Bise, 380 S.W.3d at 705-06. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-45-401 (2010), Sentencing Comm'n Cmts.

In the instant case, the Defendant's 10-year sentence was within the applicable range for the convicted offense. See  Tenn. Code Ann. § 40-35-112(a)(2) (2010).  Additionally, the trial court thoroughly reviewed the purposes and principles of the Sentencing Act and placed on the record the factors it considered and its reasons for imposing a sentence of incarceration.  Therefore, we apply an abuse of discretion standard with a presumption of reasonableness.

*Denial of Community Corrections Sentence*

The Defendant argues that the trial court abused its discretion when it denied an alternative sentence to community corrections.  We disagree.

As part of an attempt to combat the problem of overcrowding in our state prisons, the General Assembly enacted the Community Corrections Act of 1985.  See State v. Huff, 760 S.W.2d 633, 638 (Tenn. Crim. App. 1988).  The Act allows trial courts to be creative in imposing alternative sentences for certain nonviolent offenders who are either not eligible for probation or not good candidates for probation.  State v. Grigsby, 957 S.W.2d 541, 546 (Tenn. Crim. App. 1997).  Under the Act, a defendant is eligible for a sentence to community corrections if all the minimum eligibility criteria are satisfied.  Tenn. Code Ann. § 40-36-106(a)(1) (2010).  Eligible offenders are:

> (A) Persons who, without this option, would be incarcerated in a correctional institution;
>
> (B) Persons who are convicted of a property-related or drug- or alcohol-related felony offenses or other felony offenses not involving crimes against the person as provided in title 39, chapter 13, parts 1-5;
>
> (C) Persons who are convicted of nonviolent felony offenses;
>
> (D) Persons who are convicted of felony offenses in which the use or possession of a weapon was not involved;
>
> (E) Persons who do not demonstrate a present or past pattern of behavior indicating violence; and
>
> (F) Persons who do not demonstrate a pattern of committing violent offenses.

Tenn. Code Ann. § 40-36-106(a)(1)(A)-(F) (2010).  However, even though a defendant may meet the minimum eligibility requirements under the statute, the defendant is not

automatically entitled to a community corrections sentence. Grigsby, 957 S.W.2d at 547. Instead, once the trial court determines that the defendant is *eligible* for a community corrections sentence, the trial court then applies the sentencing considerations set forth in Tennessee Code Annotated section 40-35-103 as well as the general sentencing guidelines to determine whether the defendant is *entitled* to a community corrections sentence. Id.

Under Tennessee Code Annotated section 40-35-103, the trial court should look to the following considerations to determine whether a sentence of confinement is appropriate:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Tenn. Code Ann. § 40-35-103(1) (2010). Additionally, the sentence imposed should be "no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purpose for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4) (2010).

To determine the proper sentence, the trial court must consider any evidence received at the sentencing hearing, the presentence report, the principles of sentencing, arguments of counsel as to sentencing alternatives, the nature of characteristics of the offense, any applicable enhancing or mitigating factors, any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, and any statement the defendant wishes to make on his own behalf. Tenn. Code Ann. § 40-35-102, -103, -210(b)(1)-(7) (2010).

Because he pleaded guilty to a Class B felony, the Defendant is not considered a favorable candidate for alternative sentencing. See Tenn. Code Ann. § 40-35-102(6)(A) (2010). However, he is eligible for probation because he received a 10-year sentence and the offense for which he was convicted is not specifically excluded by the statute. See Tenn. Code Ann. § 40-35-303(a) (2010). The trial judge did not explicitly address the Defendant's eligibility for a community corrections sentence, but the record reflects that he would have been eligible. However, the trial court found that the "vast majority" of the probation considerations weighed against sentencing the Defendant to any form of probation in the community.

The Defendant argues that the trial court abused its discretion in its consideration of all three of the confinement considerations. First, the Defendant asserts that the trial court erred when it considered the Defendant's past drug use as "a long history criminal conduct." Instead, the Defendant contends that the presumption of innocence requires a trial court to consider only the Defendant's record of criminal convictions when looking to "criminal conduct." The Defendant also argues that his prior drug use was not the type of criminal behavior from which society needed to be protected.

Initially, we note that the statute employs the terms "conduct" as opposed to "convictions." Logically, "conduct" is broader and can encompass more than a defendant's prior conviction record. Moreover, trial courts are permitted to consider nonadjudicated criminal behavior when considering enhancement factors. State v. Massey, 757 S.W.2d 350, 352 (Tenn. Crim. App. 1988) (stating that "previous history of criminal convictions or criminal behavior" allows the trial court to look to "not only the defendant's prior conviction record . . . but also any other criminal misconduct, regardless of whether it resulted in arrest, indictment, or conviction based on counselled or uncounselled pleas, or on the verdict of a jury.") Therefore, it was not error for the trial court to look to the Defendant's extensive history of drug use as "criminal conduct." Further, the presentence report shows that the Defendant began using methamphetamine when he was 19 years old and that he used methamphetamine to stay up for long hours when he was driving a truck. Using drugs to stay awake while driving is certainly criminal conduct that poses a danger to the public. Therefore, we conclude that the trial court did not abuse its discretion when it found that confinement was necessary to protect society from a defendant who has a long history of criminal conduct.

The Defendant also argues that the trial court erred when it determined that confinement was necessary to avoid depreciating the seriousness of the offense or because confinement was particularly suited to provide an effective deterrence to others likely to commit similar offenses. The Defendant contends that the amount of the theft cannot, by itself, bar the imposition of alternative sentencing. He further claims that the trial court abused its discretion because it failed to consider evidence relating to the lack of impact the Defendant's theft had on the bottom line of "a billion-dollar multi[-]national corporation." Given the disparities between the amount of the theft and Caterpillar's net worth, the Defendant asserts that the nature of the offense was not sufficient to support the conclusion that confinement was necessary to avoid depreciating the seriousness of the offense.

This Court has previously held that "[i]n order to deny an alternative sentence based on the seriousness of the offense, the circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree, and the nature of the offense must outweigh all factors

favoring a sentence other than confinement." State v. Grissom, 956 S.W.2d 514, 520 (Tenn. Crim. App. 1997) (quoting State v. Bingham, 910 S.W.2d 448, 454 (Tenn. Crim. App. 1995) (internal quotation marks omitted). In this case, it is undisputed that the Defendant stole over one million dollars from PRS. Although the Defendant correctly states that the amount of a theft cannot, by itself, bar alternative sentencing, State v. Michael Ray Carlton, No. E2006-00294-CCA-R3-CD, 2007 WL 2262053, at *11 (Tenn. Crim. App. Aug. 8, 2007), the trial court may look "behind the plea" agreement to consider the true nature of the offense to determine that incarceration would be necessary to avoid depreciating the seriousness of the offense. State v. Charles Stillwell, No. W2000-00392-CCA-R3-CD, 2001 WL 468659, at *5 (Tenn. Crim. App. May 1, 2001). For example, in Charles Stillwell, the defendant stole approximately $150,000 from his employer. Id. at *1. He was indicted for theft over $60,000, but he entered a guilty plea to theft over $10,000, and the trial court denied alternative sentencing. Id. at *1, *2. On appeal, this Court ruled that, because the Defendant pleaded guilty to a Class C felony but the proof in the record supported a conviction for a Class B felony, the trial court properly "looked behind the plea agreement" to the true nature of the offense to conclude that incarceration was appropriate to avoid depreciating the seriousness of the offense. Id. at *5.

Likewise, the proof in the record in the instant case supports a conviction for a Class A felony, but the Defendant pleaded guilty to a Class B felony. Additionally, the Defendant admitted that he was the "mastermind" of a complicated scheme and that he conspired with and paid bribes to numerous people in the course of carrying out his plan. Therefore, the trial court properly concluded that confinement was necessary to avoid depreciating the seriousness of the offense. A determination of the theft's relative impact on Caterpillar or PRS's balance sheets was not necessary to determine the "excessive or exaggerated degree" of the offense. See Grissom, 956 S.W.2d at 520.

As to the third confinement consideration, the Defendant argues that the trial court erred when it found that the third confinement consideration, less restrictive measures had been frequently or recently applied to the Defendant unsuccessfully, did not apply. The Defendant contends that the trial court should look at the "flip side" of this factor and take into consideration the Defendant's success with the CADAS program. However, the Defendant freely acknowledges that the trial court did not rely heavily on this factor. Further, only one confinement consideration need apply to impose a sentence of incarceration. See State v. Fields, 40 S.W.3d 435, 440-41 (Tenn. 2001) (reviewing the denial of an alternative sentence where only the second confinement consideration applied to the facts of the case and ultimately reversing the lower court because the circumstances of the offenses were not "especially violent, horrifying, shocking, reprehensible, offense, or otherwise of an excessive or exaggerated degree").

Additionally, the Defendant argues that the trial court abused its discretion when it considered enhancement factors (6) and (8) and that the trial court failed to consider several applicable mitigating factors. However, he admits that, since the length of the sentence was not at issue, it is difficult to determine how consideration of the enhancement and mitigating factors impacted the sentencing decision. As noted above, erroneous weighing of enhancing and mitigating factors will not invalidate a sentence "unless the trial court wholly departed from the 1989 [Sentencing] Act, as amended in 2005." Bise, 380 S.W.3d at 706. In this case, the trial court independently addressed each of the confinement considerations, and it placed on the record its reasons for applying the considerations it relied upon. Therefore, because the length of the sentence was not at issue and the sentence is supported by the trial court's findings as to the confinement considerations, we conclude that any misapplication of the enhancing and mitigating factors would not invalidate the Defendant's sentence. The trial court did not abuse its discretion when it denied alternative sentencing.

*Restitution*

The Defendant challenges the amount of restitution ordered by the trial court, claiming that the trial court erred when it failed to determine his ability to pay while serving a 10-year sentence and made no factual finding as to which of the Defendant's assets may be liquidated to satisfy the restitution amount. He argues that his ability to pay restitution was contingent upon his receiving an alternative sentence, and he asks this Court to vacate the restitution order if the prison sentence is allowed to stand. Alternatively, the Defendant asks this Court to remand the case for the trial court to enter an order reflecting a "reasonable payment schedule and restitution amount." The State argues that the sentencing statutes permit the imposition of a sentence of confinement in conjunction with an order to pay restitution and that the trial court did not abuse its discretion when it required the Defendant to pay restitution. However, the State submits that the trial court found that the Defendant "would be unable to pay the restitution amount" and urges this Court to remand the case for clarification. We hold that the trial court did not abuse its discretion in ordering restitution, and we conclude that the case does not need to be remanded for clarification.

The Tennessee Supreme Court has not yet addressed what impact, if any, Bise has on our review of restitution orders, but we have previously applied an abuse of discretion standard with a presumption of reasonableness. State v. David Allan Bohanon, No. M2012-02366-CCA-R3-CD, 2013 WL 5777254, at *5 (Tenn. Crim. App. Oct. 25, 2013).

Restitution is mandatory in all theft convictions. See Tenn. Code Ann. § 40-20-116(a) (2012); David Allan Bohanon, 2013 WL 5777254, at *5. "The purpose of restitution is not only to compensate the victim but also to punish and rehabilitate the guilty." State v. Johnson, 968 S.W.2d 883, 885 (Tenn. Crim. App. 1997). Tennessee courts are encouraged

to order restitution when appropriate, Tenn. Code Ann. §§ 40-35-102(3)(D), -103(6), but trial courts "are without inherent power or authority to order payment of restitution except as is derived from legislative enactment." State v. Alford, 970 S.W.2d 944, 945 (Tenn. 1998).

Trial courts possess the authority to order confinement in conjunction with restitution. Tenn. Code Ann. § 40-35-104(c)(2), (8) (2010); State v. William Chandler Daniels, No. E2009-02172-CCA-R3-CD, 2010 WL 5343776, at *2 (Tenn. Crim. App. Dec. 23, 2010). However, orders of restitution, including orders issued pursuant to section 40-35-104(c)(2), must follow the procedure outlined in Tennessee Code Annotated section 40-35-304. See Tenn. Code Ann. § 30-35-304(g) (2010); State v. Brigitte Pauli, No. M2002-01607-CCA-R3-CD, 2003 WL 21302991, at *18 (Tenn. Crim. App. June 5, 2003). When determining the amount and method of payment, the trial court must consider "the financial resources and the future ability of the defendant to pay or perform." Tenn. Code Ann. § 40-35-304(d) (2010). Additionally, "[t]he court shall specify at the time of the sentencing hearing the amount and time of payment or other restitution to the victim and may permit payment or performance in installments." Tenn. Code Ann. § 40-35-304(c) (2010). Once ordered to pay restitution, the defendant is "responsible for the payment of restitution until the expiration of the sentence imposed by the court, and any payment or performance schedule established by the court shall not extend beyond the expiration date." Tenn. Code Ann. § 40-35-304(g)(2) (2010).

As part of his plea agreement, the Defendant agreed that restitution would be set between $60,000 and $250,000, and he said he wished to pay restitution in his allocution statement. The Defendant had maintained continuous employment throughout his adult life. Additionally, the Defendant indicated that he would be willing to sell off some of his assets to pay restitution. The presentence report showed that the Defendant had approximately $47,000 in assets, and the evidence presented at the sentencing hearing established that the Defendant did not have significant expenses that would interfere with his ability to pay. The record reflects that the trial court considered the Defendant's assets. It also noted that, even though the Defendant received a 10-year sentence, as a Range I offender, he could be released within three years. The court also noted that the victim's total loss was over one million dollars.

When ordering restitution, the trial court stated:

I understand [$250,000 was the maximum end of the range], but the numbers are so much greater than $250,000, that would have to be the only logical thing I could do based on the total amount of the loss.

So, you know, I don't know if you'll ever be able to pay that back, but if you can that would be the right thing to do . . . .

Both the Defendant and the State interpret the court's comment to indicate that it determined the Defendant would not be able to pay the full restitution amount. We disagree. The Defendant told the court that he was willing to pay restitution and agreed upon the range. The trial court considered the Defendant's assets as well as his earning potential. The Defendant claims that his ability to pay restitution was contingent upon receiving an alternative sentence, but the trial court noted that the Defendant would likely be released within three years, giving him seven years of community release to pay restitution. The trial court's comment does acknowledge that restitution payments will be challenging for the Defendant, but based on the evidence in the record, we cannot conclude that the trial court thought the Defendant would be unable to pay. We therefore affirm the restitution order.

### III. Conclusion

For the foregoing reasons, we affirm the judgment of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE